**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg, Esq. (*pro hac vice* pending)
C. Lee Wilson, Esq. (*pro hac vice* pending)
Jason Z. Goldstein, Esq. (*pro hac vice* pending)
Nicholaus C. Mills, Esq. (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-6317
E-mail: SGreenberg@gibsondunn.com
  CLWilson@gibsondunn.com
  JGoldstein@gibsondunn.com
  NMills@gibsondunn.com

**PORZIO, BROMBERG & NEWMAN, P.C.**
Robert M. Schechter, Esq.
Rachel A. Parisi, Esq.
Christopher P. Mazza, Esq.
5 Sylvan Way
P.O. Box 218
Parsippany, NJ 07054
Telephone: (973) 538-4006
E-mail: rmschechter@pbnlaw.com
  raparisi@pbnlaw.com
  cpmazza@pbnlaw.com

*Co-Counsel to Defendant Lenders*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>STG LOGISTICS, INC., *et al.*,<br><br>    Debtors.[1] | Chapter 11<br><br>Case No: 26-10258 (MEH)<br><br>(Jointly Administered) |
| AXOS FINANCIAL, INC. and SIEMENS FINANCIAL SERVICES, INC.,<br><br>    Plaintiffs,<br><br>    v.<br><br>RECEPTION PURCHASER, LLC, *et al.,*<br><br>    Defendants. | Adv. Pro. No. 26-01032 (MEH) |

## DEFENDANT LENDERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT

---

[1] The last four digits of Debtor STG Logistics, Inc.'s tax identification number are 8624. A complete list of each of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/STGLogistics. The location of the Debtors' service address in these Chapter 11 cases is: 5165 Emerald Parkway, Dublin, Ohio 43017.

10172634

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ...................................................................................................................... 4

    A.  The May Transactions ................................................................................................ 4

    B.  The October Transactions ........................................................................................... 5

    C.  The State Court Litigation .......................................................................................... 7

    D.  The Bankruptcy Filing ............................................................................................... 7

    E.  The Adversary Proceeding.......................................................................................... 8

ARGUMENT ........................................................................................................................... 9

    A.  Plaintiffs Fail to State a Claim for Equitable Subordination ........................................ 10

        1.  Plaintiffs' allegations regarding inequitable conduct are insufficient under
            applicable law. ................................................................................................. 11

        2.  Applying equitable subordination here would be inconsistent with the
            Bankruptcy Code. ............................................................................................ 14

    B.  Plaintiffs Have Failed to Sufficiently Plead Their Entitlement to Equitable Liens............ 16

        1.  Plaintiffs fail to plead entitlement to equitable liens on the Collateral under
            New York law. ................................................................................................. 16

        2.  Even if Plaintiffs had pleaded an explicit or implicit agreement, granting an
            equitable lien here still would be futile considering the Debtors' strong-arm
            powers under Section 544(a)(1)......................................................................... 17

    C.  Plaintiffs' Equitable Claim Is Improper as a Matter of Law .......................................... 18

        1.  New York Law prohibits the Equitable Claim because it seeks equitable relief
            when monetary relief is available. ..................................................................... 19

        2.  Plaintiffs' Equitable Claim is impermissibly duplicative of their other claims.......... 20

CONCLUSION....................................................................................................................... 23

10172634

## TABLE OF AUTHORITIES

### Cases

*Alper v. Seavey*,
9 A.D.3d 263 (1st Dep't 2004) ................................................................................21

*In re Alternate Fuels, Inc.*,
789 F.3d 1139 (10th Cir. 2015) ........................................................................10, 13

*Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*,
132 B.R. 869 (Bankr. N. D. Ill. 1991) ...................................................................13

*Ashcroft v. Iqbal*,
556 U.S. 662 ..............................................................................................................9

*In re ASHINC Corp.*,
640 B.R. 1 (Bankr. D. Del. 2022) ...........................................................................16

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*,
2021 WL 3671541 (Sup. Ct. N.Y. Cty. Aug. 16, 2021)..........................................23

*Bank of N.Y. v. Epic Resorts–Palm Springs Marquis Villas (In re Epic Capital
Corp.)*,
290 B.R. 514 (Bankr. D. Del. 2003) ..................................................................11, 13

*Canstar v. J.A. Jones Constr. Co.*,
212 A.D.2d 452 (1st Dep't 1995) ............................................................................23

*Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
160 F.3d 982 (3d Cir. 1998)...............................................................................2, 15

*Coast to Coast Energy, Inc. v. Gasarch*,
53 N.Y.S.3d 16 (1st Dep't 2017) ............................................................................23

*Deutsche Bank Tr. Co. Ams. v. Cox*,
110 A.D.3d 760 (2d Dep't 2013) .........................................................................3, 17

*Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*,
126 B.R. 63 (9th Cir. BAP 1991)............................................................................12

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S. D. Ohio 1988).....................................................................13

*Havell Cap. Enhanced Mun. Income Fund, L.P. v. Citibank, N.A.*,
84 A.D.3d 588 (1st Dep't 2011) .........................................................................23, 24

*Matter of Herby's Foods, Inc.*,
2 F.3d 128 (5th Cir. 1993) ................................................................................15, 16

*In re Jevic Holding Corp.*,
2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011)................................................12

10172634

*Lantau Holdings Ltd. v. General Pac. Grp. Ltd.*,
    163 A.D.3d 407 (1st Dep't 2018) ...............................................................................20

*In re Lazar*,
    83 F.3d 306 (9th Cir. 1996) .......................................................................................10

*In re Lehman Bros. Holdings Inc.*,
    541 B.R. 551 (S.D.N.Y. 2015)..............................................................................12, 14

*Lichtyger v. Franchard Corp.*,
    18 N.Y.2d 528 (1966) ................................................................................................20

*Matter of Lifschultz Fast Freight*,
    132 F.3d 339 (7th Cir. 1997) .....................................................................................10

*MBIA Ins. Co. v. GMAC Mortg. LLC*,
    914 N.Y.S.2d 604 (N.Y. Sup. Ct. 2010) ...................................................................23

*In re Mid–Am. Waste Sys., Inc.*,
    284 B.R. 53 (Bankr. D. Del. 2002) ......................................................................12, 13

*Mill Fin., LLC v. Gillett*,
    122 A.D.3d 98 (1st Dep't 2014) .......................................................................4, 22, 24

*Nasdaq, Inc. v. Exchange Traded Mgrs. Grp., LLC*,
    431 F. Supp. 3d 176 (S.D.N.Y. 2019)........................................................................20

*Netologic, Inc. v. Goldman Sachs Grp., Inc.*,
    110 A.D.3d 433 (1st Dep't 2013) ...............................................................................23

I*n re Nutri/System, Inc.*,
    169 B.R. 854 (Bankr. E.D. Pa. 1994), *aff'd sub nom. In re Nutri/Sys. of Fla.
    Assocs.*, 178 B.R. 645 (E.D. Pa. 1995) .....................................................................10

*Off. Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp.
    Holdings, LLC (In re HH Liquidation, LLC)*,
    590 B.R. 211 (Bankr. D. Del. 2018) ..........................................................................10

*In re Radnor Holdings Corp.*,
    353 B.R. 820 (Bankr. D. Del. 2006) ..........................................................................10

*In re Sabine Oil & Gas Corp.*,
    547 B.R. 503 (Bankr. S.D.N.Y. 2016)........................................................................10

*Santiago v. Warminster Twp.*,
    629 F.3d 121 (3d Cir. 2010).........................................................................................9

*SCM Corp. v. Xerox Corp.*,
    507 F.2d 358 (2d Cir. 1974).......................................................................................20

*SFR Invs. Pool 1, LLC v. NewRez LLC*,
    2022 WL 17061225 (D. Nev. Nov. 17, 2022) ...........................................................19

iv

*In re SHC, Inc.*,
    329 B.R. 438 (Bankr. D. Del. 2005) .................................................................11, 12, 13

*Solus Alt. Asset Mgmt. LP v. GSO Cap. Partners L.P.*,
    2018 WL 620490 (S.D.N.Y. Jan. 29, 2018) .................................................................4, 20

*Stoumbos v. Kilimnik*,
    988 F.2d 949 (9th Cir. 1993) .................................................................15

*In re Tropicana Ent.*,
    LLC, 520 B.R. 455 (Bankr. D. Del. 2014).................................................................9

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996).................................................................20

*In re W.T. Grant Co.*,
    699 F.2d 599 (2d Cir. 1983).................................................................14

*Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*,
    161 B.R. 107 (E. D. Pa. 1993) .................................................................13

*Wesco Aircraft Holdings, Inc. v. SSD Investments Ltd.*
    2025 WL 3514358 (S.D. Tex. Dec. 8, 2025) .................................................................21

*In re Winstar Commc'ns, Inc.*,
    554 F.3d 382 (3d Cir. 2009).................................................................2, 11, 12, 15

*In re Woodbridge Grp. of Companies*,
    LLC, 593 B.R. 200 (Bankr. D. Del. 2018).................................................................16

*In re Zohar III, Corp.*,
    639 B.R. 73, *aff'd*, 620 F. Supp. 3d 147 (D. Del. 2022).................................................................14, 15

**Statutes**

11 U.S.C. § 362(a) .................................................................7

11 U.S.C. § 510(c) .................................................................2, 10, 15, 16

**Other Sources**

Amit Chowdhry, *STG Logistics: Containerized Logistics Services Company
    Closes $300 Million In Financing* (October 7, 2024), https://pulse2.com/stg-
    logistics-containerized-logistics-services-company-closes-300-million-in-
    financing/ .................................................................6

*STG Logistics Closes on $300M Growth-Oriented Financing Package*,
    FREIGHTWAVES (OCT. 4, 2024), https://www.freightwaves.com/news/stg-
    logistics-closes-on-300m-growth-oriented-financing-package .................................................................6

10172634

Defendant Lenders,[2] by and through undersigned counsel, respectfully submit this memorandum of law in support of their motion to dismiss Count XV of the Complaint (the "Equitable Claim") with prejudice.

## PRELIMINARY STATEMENT

Plaintiffs and Defendant Lenders are sophisticated investors who entered into a detailed Credit Agreement governing $875 million in syndicated debt with STG (as defined in the Complaint, "STG" or the "Debtors"). STG and the Defendant Lenders, who constituted Required Lenders under the Credit Agreement, later amended that agreement as expressly permitted by the Credit Agreement to facilitate STG's execution of the October Transactions—a series of steps that provided the Debtors with $300 million in critical liquidity that preserved the value of Debtors' assets and operations for the benefit of all stakeholders, including the Plaintiffs. Despite Defendant Lenders' rescue funding of the Debtors, the protracted headwinds in the Debtors' industry caused STG to file for bankruptcy relief in this Court.

Before bankruptcy, there was broad consensus that the October Transactions were beneficial to the Debtors and fully compliant with the Credit Agreement. When the October Transactions closed, over 95% of the Debtors' then-existing secured lenders supported the transactions. Yet Plaintiffs (two disgruntled holdout lenders apparently bound and determined to engage in a scorched-earth litigation campaign) now ask this Court in Count XV to equitably subordinate Defendant Lenders' claims to punish them for providing substantial liquidity and deleveraging to the Debtors prepetition. The allegations of the Complaint provide no basis for doing so. The Court should dismiss Count XV.

---

[2] Capitalized terms used but not otherwise defined herein have the meaning defined in the Complaint (Adversary Proceeding Dkt. 1).

1

It is telling that Plaintiffs plead Count XV only in the alternative to their contract claims. Count XV seeks equitable subordination of Defendant Lenders' claims and equitable liens on the Collateral (as defined in the Complaint), but only "if the Court finds that the [October Transactions were] valid." Compl. ¶ 286. Thus, Plaintiffs' position is that even if the Court finds that the October Transactions complied with the Credit Agreement and provided the Debtors with significant value, they nonetheless are entitled to superior treatment in the Debtors' bankruptcy cases—all because Defendant Lenders lawfully contracted with the Debtors prepetition.

New York law and the Bankruptcy Code do not support that claim, which must be dismissed, for at least six reasons.

**First**, Plaintiffs' equitable-subordination claim fails because they do not plausibly allege the "inequitable conduct" required under Section 510(c). For non-insiders like Defendant Lenders, the Third Circuit demands "egregious conduct such as fraud, spoliation or overreaching." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 412 (3d Cir. 2009) (citation omitted). Plaintiffs allege nothing of the sort. Conclusory assertions of "bad faith" and "secrecy" fall far short.

**Second**, even if Plaintiffs could establish some cognizable harm, subordinating "any and all claims" of Defendant Lenders would result in an impermissible windfall—precisely what the Bankruptcy Code forbids. *See Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 (3d Cir. 1998) (equitable subordination "should not result in a windfall to those benefitted by it"). Indeed, Plaintiffs seek equitable subordination solely to the extent that the Court finds that the transaction complied with the applicable credit documents. As such, Plaintiffs would ask that this Court use an extraordinary remedy (equitable subordination) to strip liens and claims from lenders who provided the Debtors with hundreds of millions of dollars in a transaction that this Court would have found complied with the Credit Agreement

2

before reaching this "alternative" claim.  Of course, third-party lenders engaging in transactions prompted by a borrower that complied with the applicable Credit Agreement is not even remotely the character of conduct that courts remedy with equitable subordination.

**Third**, Plaintiffs' request for equitable liens fails on its own terms and turns the concept of equitable liens on its head.  Plaintiffs bring Count XV only "if the Court finds" the challenged October Transactions valid.  Compl. ¶ 286.  But if the Transactions were valid, so too were the agreements that effectuated them—which are the exact agreements that Plaintiffs argue resulted in their losing certain of their security interests.  Plaintiffs' argument that there was some type of implied agreement between Plaintiffs and the Company or Defendant Lenders that allowed Plaintiffs to retain liens on the exact Collateral that the Transactions released, is inherently contradictory and fails as a matter of law.  *See Deutsche Bank Tr. Co. Ams. v. Cox*, 110 A.D.3d 760, 761 (2d Dep't 2013) ("New York law allows the imposition of an equitable lien if there is an express or implied agreement that there shall be a lien on specific property.") (citation omitted).

**Fourth**, even if Plaintiffs could establish some entitlement to equitable liens, any such interest would be avoided by the Debtors' strong arm powers under Section 544(a)(1) of the Bankruptcy Code, rendering that relief futile and impermissible.

**Fifth**, Plaintiffs' request for equitable relief is foreclosed because they have an adequate remedy at law.  The economic impact of the October Transactions—if any harm occurred at all— is readily quantifiable.  Plaintiffs themselves allege as much: "[t]he reduction in value of the Loans as a result of the Scheme is reflected in their trading prices."  Compl. ¶ 114.  Where damages are calculable, equitable remedies are unavailable.  *See Solus Alt. Asset Mgmt. LP v. GSO Cap. Partners L.P.*, 2018 WL 620490, at \*6 (S.D.N.Y. Jan. 29, 2018) (where "the impact of [a]

3

10172634

challenged . . . transaction is essentially economic, . . . 'unscrambling'—restoration to pre-transaction positions—is not necessary to remedy any harm").

**Sixth**, Plaintiffs' implied-covenant claim (Count XII) seeks the exact same relief—avoidance of the October Transactions—premised on the very same allegations of "bad faith" and "secrecy" that underlie Count XV.  And the same is true with respect to Plaintiffs' contract-breach and declaratory judgment claims; they are plainly and impermissibly duplicative of Plaintiffs' Equitable Claim.  Plaintiffs are not entitled to two bites at the same apple as a matter of New York Law.  *See Mill Fin., LLC v. Gillett*, 122 A.D.3d 98, 104–105 (1st Dep't 2014) (claims are impermissibly duplicative when "[the causes of action] arise from the same operative facts").

Count XV should be dismissed with prejudice.

## BACKGROUND

In 2022, STG acquired a division of XPO Inc. to become a nationwide logistics company. *See* Compl. ¶ 6.  To fund that acquisition, STG raised $875 million in debt by incurring Loans under a 2022 Credit Agreement (the "Credit Agreement"), under which Antares is the administrative agent.  *Id.* ¶¶ 7, 37.  More than 150 Lenders held those Loans at the time of the challenged transactions in October 2024, including Plaintiffs and Defendant Lenders.  *Id.* ¶¶ 8, 38–57.

### A.    The May Transactions

After the Loans were issued, the logistics industry encountered substantial headwinds. Compl. ¶¶ 84–85.  By early 2024, it became clear that STG required a capital infusion and debt flexibility to continue its operations and ongoing expansion.  *Id.*  STG accordingly executed the May Transactions with Required Lenders, in which the Equity Sponsors invested $30 million and STG, the Agent, and the Required Lenders "agreed to place certain financial covenants . . . on a seven-quarter holiday" through the Fifth Amended Agreement.  *Id.* ¶ 87.

10172634

Section 10.1 of the Credit Agreement expressly states that it may be amended upon consent of the Company and the Required Lenders. *See* Compl. ¶ 107. The Agreement delineates only eight exceptions to the Required Lenders consent standard, which Plaintiffs describe as so-called "sacred rights," *id*. ¶¶ 18, 93. An amendment only requires the consent of all Lenders who are "directly and adversely affected thereby" if an amendment falls within one of those narrow exceptions. *Id.* ¶¶ 18, 118–119.

Plaintiffs explicitly concede the validity of the May Transactions, the Fifth Amended Agreement, and that it was approved by the Required Lenders as permitted under section 10.1 of the Original Credit Agreement—even though Plaintiffs were not in the group that consented to it. *See id.* ¶¶ 93, 107.

## B.    The October Transactions

But as Plaintiffs acknowledge, it was possible that STG might require financial support beyond the May Transactions. *Id.* ¶ 88. STG and the Equity Sponsors allegedly reached out to certain of the Defendant Lenders and began to negotiate toward a solution in August 2024. *Id.* ¶¶ 12–13. Following these negotiations, STG and the Defendant Lenders executed the October Transactions, which included entry into three agreements: (1) the "Sixth Amended Agreement"; (2) "the Dropdown Credit Agreement"; and (3) the "Intercompany Credit Agreement." *Id.* ¶ 13.

As a result of the October Transactions, the Company secured more than $180 million in financing—including $136 million of new money from Defendant Lenders—fueling the Company's current operations and ongoing expansion and preserving the operations and assets that serve as the support for Plaintiffs' claims and liens.[3] Industry publications hailed the October

---

[3] *See* STG Logistics, *STG Logistics Secures $300 Million Financing to Drive Future Growth*, PR NEWSWIRE (Oct. 3, 2024), https://www.prnewswire.com/news-releases/stg-logistics-secures-300-million-financing-to-drive-future-growth-302267333.html.

10172634

Transactions as critical to STG's ability "to continue investing in innovative solutions, expand its service offerings, and enhance operational efficiency as it advances its mission of delivering best-in-class logistics services across the country."[4]   Plaintiffs do not dispute that the October Transactions were the only feasible means for STG to obtain this critical financing.

As the first step in the October Transactions, STG, the Agent, and the Defendant Lenders executed the Sixth Amended Agreement.  As with the Fifth Amendment, the Sixth Amendment was executed with the consent of the Required Lenders and amended similar provisions as the Fifth Amendment.  *See* Compl. ¶¶ 13(a), 118.  STG then separately designated two "newly created subsidiaries"—UnSub—"as unrestricted subsidiaries."  *Id*. ¶ 104.  STG then transferred two of its business segments from STG to UnSub (leaving at least two business segments in STG); and STG "prepaid [certain of Defendant Lenders'] existing Loans in exchange for . . . a mix of new . . . UnSub Loans, backed . . . by the . . . assets transferred from STG to UnSub [and] by a *pari passu* first-lien guarantee from STG and a security interest in a *pari passu* first-lien secured intercompany loan from UnSub to STG."  *Id. ¶¶* 13(c)–(e), 104–105.  STG then offered all other lenders the opportunity to similarly extend new loans to UnSub and have their Loans prepaid by STG at a discount to par value (the "Offer"), just as Defendant Lenders' Loans were voluntarily prepaid at a discount.  *Id*. ¶¶ 13(d), 106.  As Plaintiffs acknowledge, "many" of the other lenders accepted the Offer.  *Id*. ¶ 113.  Plaintiffs also acknowledge that both the Offer's new loans to UnSub and Defendant Lenders' new loans to UnSub represented a discount to the par value of the Loans prepaid by STG.  *Id*. ¶¶ 13(c)–(d), 106.

---

[4] Amit Chowdhry, *STG Logistics: Containerized Logistics Services Company Closes $300 Million In Financing* PULSE 2.0 (Oct. 7, 2024), https://pulse2.com/stg-logistics-containerized-logistics-services-company-closes-300-million-in-financing/; *see* Todd Maiden, *STG Logistics Closes on $300M Growth-Oriented Financing Package*, FREIGHTWAVES (OCT. 4, 2024), https://www.freightwaves.com/news/stg-logistics-closes-on-300m-growth-oriented-financing-package.

10172634

### C.      The State Court Litigation

Plaintiffs, whose claims represent approximately 5% of the total loans outstanding under the Credit Agreement at the time of the October Transactions, are the only lenders who did not accept the Offer, opting instead to sue Defendants.  Plaintiffs filed suit in New York State Court, Commercial Division, on January 8, 2025 (NYSCEF No. 2) and filed an Amended Complaint on January 30, 2025 to name Defendant Lenders (the operative complaint, the "State Court Complaint").  *Id*. ¶ 22.  The State Court Complaint alleged thirteen causes of action, and only two against the Defendant Lenders.  *See* Compl. Ex. A.

Defendants moved to dismiss on March 31, 2025.  While the motions to dismiss were pending before the New York Court, the parties proceeded through fact discovery and the deadline for substantial completion of document productions passed in October 2025.  Compl. ¶ 27.[5]  The Court largely denied Defendants' motions to dismiss on January 3, 2026.  *Id*. ¶ 24 (decision attached as Ex. A).  After Debtors' counsel advised the New York Court of the bankruptcy filings (discussed below), the New York Court entered an order on January 16, 2026 staying the state-court litigation pending resolution of the Chapter 11 cases pursuant to 11 U.S.C. § 362(a).  *Id*. ¶ 30.

### D.      The Bankruptcy Filing

On December 31, 2025, STG failed to make a scheduled payment of principal and interest on Plaintiffs' Loans.  *Id*. ¶ 151.  On January 12, 2026 (the "Petition Date"), each Debtor filed a voluntary Chapter 11 petition in this Court.  *Id*. ¶ 28.  On February 4, 2026, the parties to the state-

---

[5] Despite Plaintiffs' allegations to the contrary, the parties in fact completed document discovery in that action and were about to begin depositions in early January 2026, until STG filed for bankruptcy.  *See generally* Debtor Defendants' Response in Opposition to Plaintiffs' Motion to Compel Defendants to Respond to Plaintiffs' Document Requests and Interrogatories, Adversary Proceeding Dkt. 14.

10172634

court litigation—Plaintiffs, Defendant Lenders, STG, and the Antares Defendants—filed an agreed-upon stipulation through which they "agreed to fully litigate and have the Bankruptcy Court adjudicate all issues and claims between the Parties, including without limitation, the State Court Claims in connection with the Chapter 11 Cases and any adversary proceeding filed in connection therewith"; (2) "consent[ed] to the Bankruptcy Court finally hearing and deciding these issues and claims"; (3) "agree[d] that Defendants will answer, and will not move to dismiss or move for judgment on the pleadings with respect to, any claims in the Adversary Proceeding on which the State Court Decision denied Defendants' motions to dismiss."  Stipulation and Order, Bnkr. Dkt. No. 215, at 10–12.

### E.      The Adversary Proceeding

On February 4, 2026, Plaintiffs filed the Complaint to initiate the Adversary Proceeding. Compl. ¶ 1.  The Complaint asserted twelve of the same causes of action as in the State Court Complaint and added three new causes of action, including two against Defendant Lenders and Antares: XIII and XV.  *Id*. ¶¶ 22–24, 267–276, 286–293.

Count XV—the subject of the present motion—is a cause of action for equitable subordination and equitable liens against Defendant Lenders and Antares.  *Id*. ¶ 286.  Plaintiffs request that, "if the Court finds that the [October Transactions were] valid (which [they were] not), the Court . . . (a) equitably subordinate all claims of the Defendant Lenders to the claims of Plaintiffs; and (b) grant Plaintiffs equitable liens to the 'Collateral' . . . with priority over any liens purportedly held by the Defendant Lenders by virtue of their holding of the UnSub Loans."  *Id*. Plaintiffs allege that equitable subordination is justified because "Defendant Lenders' . . . executed the [October Transactions] in secret to obtain non-pro-rata benefits while simultaneously exiting the Credit Agreement . . . to avoid suffering the consequences of the Scheme's bad faith amendments . . . ."  *Id*. ¶ 288.  And they allege that they are entitled to equitable liens on the

8

Collateral because "Plaintiffs and the Defendant Lenders entered into express agreements that granted them liens . . . demonstrating a clear intent to create a security interest" in the collateral, and through the October Transactions, "STG transferred substantially all collateral assets securing Plaintiffs' Loans to UnSub, thereby depriving Plaintiffs of [those] security interests." *Id.* ¶¶ 291–292.

Defendant Lenders filed their motion to dismiss Cause of Action XV, and this supporting memorandum of law, on February 18, 2026.

## ARGUMENT

Fed. R. Civ. P. 12(b)(6), made applicable by Fed. R. Bankr. P. 7012(b), governs a motion to dismiss for failure to state a claim upon which relief can be granted. *In re Tropicana Ent.*, LLC, 520 B.R. 455, 466–67 (Bankr. D. Del. 2014). Courts in the Third Circuit apply a three-step process to determine the sufficiency of a complaint: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664).

As discussed above, Count XV fails for numerous independent reasons that fall into three general categories. First, Plaintiffs fail to state a claim for equitable subordination because they do not plausibly allege the "inequitable conduct" required for subordination of a non-insider's claims, and because subordinating all of Defendant Lenders' claims would result in a windfall inconsistent with the Bankruptcy Code. Second, Plaintiffs fail to state a claim for equitable liens because they have not pled the existence of any agreement—express or implied—entitling them to liens on the transferred Collateral, and because any equitable interest would be avoided by the

9

Debtors' strong-arm powers.  Third, New York law bars the equitable relief Plaintiffs seek because monetary damages are available and the Equitable Claim is impermissibly duplicative of Plaintiffs' other claims.

### A.        Plaintiffs Fail to State a Claim for Equitable Subordination

The Bankruptcy Code provides that a "court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate." 11 U.S.C. § 510(c).

Because "[e]quitable subordination is an extraordinary measure which is not lightly invoked[,]" I*n re Nutri/System, Inc.*, 169 B.R. 854, 865 (Bankr. E.D. Pa. 1994), *aff'd sub nom. In re Nutri/Sys. of Fla. Assocs.*, 178 B.R. 645 (E.D. Pa. 1995), courts have delineated three arduous preconditions to ensure that it is only "applied sparingly[,]" *Off. Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 298 (Bankr. D. Del. 2018):[6] "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *In re Winstar Commc'ns, Inc.*,

---

[6] *See, e.g., In re Radnor Holdings Corp.*, 353 B.R. 820, 840 (Bankr. D. Del. 2006) (describing equitable subordination as a "drastic" and "unusual" remedy); *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 564 (Bankr. S.D.N.Y. 2016) ("Equitable subordination is an extraordinary remedy that is to be used sparingly." (internal quotation marks and citation omitted)); *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 349 (7th Cir. 1997) ("A bankruptcy court should be doubly wary of using its power of equitable subordination."); *In re Lazar*, 83 F.3d 306, 309 (9th Cir. 1996) ("[E]quitable subordination is an unusual remedy which should be applied only in limited circumstances."); *In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1154 (10th Cir. 2015) ("[E]quitable subordination is an extraordinary remedy to be employed by courts sparingly.").

10172634

554 F.3d 382, 411 (3d Cir. 2009) (citation and internal quotation marks omitted).   And when the

targeted claimant is a non-insider, such as Defendant Lenders, courts require "***evidence*** of ***more***

***egregious*** conduct ***such as fraud***, spoliation or overreaching . . . ." *Id.* at 412 (internal quotation

marks omitted, citation omitted, and emphasis added).

The Court should dismiss Plaintiffs' equitable subordination claim.  Plaintiffs fail to allege

particularized facts against non-insider Defendant Lenders that could plausibly support either

inequitable conduct or a finding that the relief request is not inconsistent with the Bankruptcy

Code.  *See In re SHC, Inc.*, 329 B.R. 438, 447 (Bankr. D. Del. 2005) (noting that allegations with

respect to inequitable subordination are sufficient only if they are alleged "with particularly")

(citing *Bank of N.Y. v. Epic Resorts–Palm Springs Marquis Villas (In re Epic Capital Corp.*), 290

B.R. 514, 524 (Bankr. D. Del. 2003)).

> 1.      Plaintiffs' allegations regarding inequitable conduct are insufficient under applicable law.

Plaintiffs categorically fail to allege any conduct by Defendant Lenders that even remotely

approximates the extreme conduct that courts have required to find inequitable conduct by non-

insiders.

To start, Plaintiffs do not (nor could they) allege that Defendant Lenders were insiders.[7]

Courts in the Third Circuit consider insider status "in relation to the debtor at the time of the act"

as "[t]he ***most important factor*** in determining if a claimant has engaged in inequitable conduct

for the purposes of equitable subordination is whether the claimant was an insider or outsider . . . ."

*In re Mid–Am. Waste Sys., Inc.*, 284 B.R. 53, 69 (Bankr. D. Del. 2002) (emphasis added).  "If the

---

[7] Nor could they, as there is no evidence that Defendant Lenders "exercised control over [STG] sufficient to become, in effect, its alter ego."  *In re Lehman Bros. Holdings Inc.*, 541 B.R. 551, 582–83 (S.D.N.Y. 2015).

11

10172634

claimant is not an insider," as is the case here, "then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary." *In re Winstar Commc'ns, Inc.*, 554 F.3d at 412 (internal quotation marks and citation omitted).

Plaintiffs' allegations fall far short of stating facts that would support a claim under the rigorous non-insider standard. Instead of alleging the requisite "egregious conduct" necessary to state an equitable subordination claim against a non-insider, *id.*, Plaintiffs make two conclusory assertions: Defendant Lenders executed (1) the October Transactions in secret; and (2) the Sixth Amendment in bad faith. Compl. ¶ 288.[8] But bad faith and secrecy, even if demonstrated, are a far cry from the requisite allegations of "fraud, illegality or some other breach of a legally recognized duty." *In re Lehman Bros. Holdings Inc.*, 541 B.R. 551, 583 (S.D.N.Y. 2015) (internal quotation marks and citation omitted).[9] Defendant Lenders are not aware of any case in which a court found that bare allegations of bad faith and/or secrecy were sufficient to state a claim of inequitable conduct against a non-insider. *Compare In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1156 (10th Cir. 2015) ("[A] claim of even 'probable' unfair conduct should not serve as the basis

---

[8] Plaintiffs fail to allege any underlying factual support for their general assertions of "secrecy" and "bad faith." Compl. ¶ 288. Plaintiffs do not suggest what conduct qualified as "secre[t]", nor do they plead why the alleged "secrecy" was impermissible, unusual, or inappropriate. *Id.* To the contrary, transaction negotiations are often negotiated subject to NDAs. The Court should accordingly disregard those conclusory assertions, especially because those allegations must be made "with particularity" in this context. *In re SHC, Inc.*, 329 B.R. at 447 (citation omitted); *see, e.g., In re Jevic Holding Corp.*, 2011 WL 4345204, at *14 (Bankr. D. Del. Sept. 15, 2011) ("Based on such sparse allegations, however, the Court cannot conclude that the Committee has sufficiently alleged a claim for equitable subordination against CIT and will therefore dismiss this claim.").

[9] *See, e.g., In re SHC, Inc.*, 329 B.R. at 447 (Fraud, spoliation, over-reaching, breach of fiduciary duties, undercapitalization, and the claimant's use of the debtors as a mere instrumentality are examples of egregious misconduct.); *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 71 (9th Cir. BAP 1991) (finding that for non-insider claimants, the objecting party must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others); *Century Glove*, 151 B.R. at 333; *In re Future Energy Corp.*, 83 B.R. 470, 483 (Bankr. S. D. Ohio 1988) (finding that for non-insider and non-fiduciary claimants, the standard of proof is egregious conduct such as fraud, spoliation or overreaching); *see also, e.g., Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 118 (E. D. Pa. 1993) (similar); *Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 896 (Bankr. N. D. Ill. 1991) (similar); *Epic Capital*, 290 B.R. at 524 (similar); *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 70 (similar).

10172634

for the extreme remedy of equitable subordination.") *with In re SHC, Inc.*, 329 B.R. at 447 (holding that "the Debtors have pled sufficient facts to put Sierra on notice of the alleged fraudulent conduct underlying the claim for equitable subordination . . . against a non-insider."). And here, Plaintiffs' pleading with respect to Count XV assumes "the Court finds that the [Transactions were] valid[,]" *id*. ¶ 286, and therefore expressly undercuts any plausible basis for finding they were done in "bad faith[,]" *id*. ¶ 288.[10]

Plaintiffs also allege that STG's "and the Defendant Lenders' tactics in the [C]hapter 11 cases" are "the culmination of [Defendants'] bad-faith efforts to appropriate Plaintiffs' bargained-for value through the Scheme." Compl. ¶ 5. And they assert that the Debtors used inappropriate "tactics such as the DIP Motion to attempt to consolidate the ill-gotten value that STG and Defendant Lenders obtained via the Scheme." *Id*. ¶ 153.

But the Debtors filed these Chapter 11 Cases because of years of headwinds in the freight industry, and they needed post-petition financing to fund their operations. The DIP Lenders provided that financing and received customary lender protections, which were supported by holders of approximately 100 percent, 99 percent, 94 percent, and 83 percent of the STG Distribution RCF, FLFO Term Loans, FLSO Term Loans, and FLTO Term Loans, respectively. And the Court finally approved the DIP on a fully consensual basis. Fully consensual post-petition financing cannot be evidence of bad faith or an unlawful "scheme"—it was affirmatively approved by this Court.[11]

---

[10] Not only do Plaintiffs' fail to allege any bad faith, but the record conclusively demonstrates that **Defendant Lenders consented to the October Transactions and later bankruptcy proceedings in good faith**—i.e., to maximize the value of STG and the related estate for the benefit of all stakeholders (including Plaintiffs)—as Defendant Lenders will prove.

[11] *See generally* Declaration of Tyler Holtgreven, Chief Financial Officer of STG Logistics, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions, Bnkr. Dkt. 33; Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing

At most, Plaintiffs have alleged that Defendant Lenders used their bargaining position to improve their relative position of the existing claims. But Courts have repeatedly held that "*there is generally no objection to a creditor's using his bargaining position . . . to improve the status of his existing claims*" where "voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act . . . are not present." *In re Lehman Bros. Holdings Inc.*, 541 B.R. at 583 (internal quotation marks omitted, citing *In re W.T. Grant Co.*, 699 F.2d 599, 610 (2d Cir. 1983), and emphasis added). As a court in the Third Circuit recently held, "the pursuit of one's legal rights, including the exercise of contractual rights, may not be grounds for equitable subordination 'even if the rights are exercised harshly and cause harm to other creditors.'" *In re Zohar III, Corp.*, 639 B.R. 73, 113 (Bankr. D. Del.), *aff'd*, 620 F. Supp. 3d 147 (D. Del. 2022) (citation omitted). So too here.

The Court should therefore deny Plaintiffs' request for the extraordinary remedy of equitable subordination.

### 2. Applying equitable subordination here would be inconsistent with the Bankruptcy Code.

Next, "equitable subordination of the claim in question must not be inconsistent with the Bankruptcy Code." *In re Zohar III, Corp.*, 639 B.R. at 93–94. Equitable subordination is governed by Section 510(c) of that Code. *In re Winstar Commc'ns, Inc.*, 554 F.3d at 411. That Section "simply 'codified' existing judge-made doctrine, and development of the substantive standards for equitable subordination has been left to the courts." *Id*. One of those standards is that "equitable

---

Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief, Bnkr. Dkt. 84; Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief, Bnkr. Dkt. 248.

14

10172634

subordination [is] a 'remedial rather than penal' doctrine," *id.* (citation omitted), and "should not result in a windfall to those benefitted by it . . . ." *Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 (3d Cir. 1998); *see Stoumbos v. Kilimnik*, 988 F.2d 949, 960 (9th Cir. 1993) ("A claim will be subordinated only to the claims of other creditors whom the inequitable conduct has disadvantaged."); *Matter of Herby's Foods, Inc.*, 2 F.3d 128, 131 (5th Cir. 1993) (subordination proper only to the extent necessary to offset the harm the creditors suffered as a result of the inequitable conduct).

Plaintiffs' request that "any and all claims of the Defendant Lenders as a lender of the debtors should be subordinated for purposes of distribution to the claims of Plaintiffs, pursuant to Sections 510(c) and 105(a) of the Bankruptcy Code," Compl. ¶ 289, is inconsistent with the Bankruptcy Code because, by equitably placing Plaintiffs' claims higher in the priority waterfall than Defendant Lenders, it would go far beyond remedying the harm that Plaintiffs assert. *Cf.* Compl. 287 (asserting the harm that "all Defendant Lenders secured a superior credit position as compared to the other lenders who previously shared the same first-lien position."). Even assuming that Plaintiffs' pleading was sufficient to support a finding of inequitable conduct (it is not), Plaintiffs' requested remedy to be vaulted over Defendant Lenders would be anything but equitable.

Prior to the October Transactions, Plaintiffs were *pari passu* creditors who owned approximately 5% of the Debtors' existing secured debt. Plaintiffs (having provided no value to the Company) now request through Count XV to have their minority claim artificially elevated to a new super-senior tranche, such that, for every dollar that comes into the estate for the benefit of secured creditors, Plaintiffs would receive 100 cents (and Defendant Lenders could recover only

15

after Plaintiffs are repaid in full). This windfall is neither consistent with the Bankruptcy Code's priority scheme nor equitable in light of the harm alleged by Plaintiffs.

In sum, the Court should deny Plaintiffs' request for equitable subordination because subordinating Defendant Lenders' claims would result in a windfall to Plaintiffs inconsistent with Section 510(c). *In re ASHINC Corp.*, 640 B.R. 1, 58 (Bankr. D. Del. 2022) (Refusing to award equitable subordination because "[a]warding [it] under these circumstances would grant [the plaintiffs] an undeserved windfall."); *see Herby's Foods*, 2 F.3d at 131 (finding subordination proper only to extent necessary to offset the harm the creditors suffered as a result of the inequitable conduct).

**B.      Plaintiffs Have Failed to Sufficiently Plead Their Entitlement to Equitable Liens**

Plaintiffs' request for equitable liens fails for two reasons. First, Plaintiffs have not sufficiently pled their entitlement under New York law. Second, even if they had, any equitable lien would be avoided by the Court's strong-arm power—rendering the relief futile.

> 1.      Plaintiffs fail to plead entitlement to equitable liens on the Collateral under New York law.

"Whether a court should impose a constructive trust or equitable lien upon property is first determined by reference to state law," *In re Woodbridge Grp. of Companies*, LLC, 593 B.R. 200, 212–13 (Bankr. D. Del. 2018); here, New York. "New York law allows the imposition of an equitable lien if there is an express or implied agreement that there shall be a lien on specific property." *Deutsche Bank Tr. Co. Ams.,* 110 A.D.3d at 761 (citations omitted).

Plaintiffs cannot make that showing. The only plausible basis from which a court could infer such an agreement is Plaintiffs' allegation that "[b]y the Fifth Amended Agreement, Plaintiffs and the Defendant Lenders entered into express agreements that granted them liens in the assets of STG and its subsidiaries to secure their obligations under the Fifth Amended Agreement,

16

therefore demonstrating a clear intent to create a security interest [in the Collateral]." Compl. ¶ 291. But Plaintiffs affirmatively plead their Equitable Claim under the condition that "the Court finds that the [October Transactions were] valid . . . ." *Id*. ¶ 286. If the Court makes that finding, it will necessarily have found that the various agreements that effected those transactions were similarly valid—including finding that the Sixth Amended Agreement which expressly superseded the Fifth Amended Agreement (the sole basis upon which Plaintiffs allege there was the requisite express or implied agreement). If the October Transactions are valid, then Plaintiffs agree that their security interest in the Collateral could be extinguished and those transactions resulted in "STG transfer[ing the Collateral] securing Plaintiffs' Loans to UnSub, thereby depriving Plaintiffs of their security interests in those assets." *Id*. ¶ 292.

According to Plaintiffs' own pleading, therefore, there cannot have been any express or implied agreement that Plaintiffs would retain liens on the Collateral that was transferred by those transactions and agreements. Plaintiffs' own pleading vitiates their requested equitable liens under New York law.

### 2.    Even if Plaintiffs had pleaded an explicit or implicit agreement, granting an equitable lien here still would be futile considering the Debtors' strong-arm powers under Section 544(a)(1).

Even if Plaintiffs had alleged a sufficient basis for an equitable lien on the Collateral (they have not), imposing that lien would be futile because such lien could be avoided under the strong arm clause of the Bankruptcy Code. Section 544(a)(1) of the Bankruptcy Code bestows the Debtors with the status of a hypothetical lien creditor and provides the Debtors with the power to avoid any security interest in its property that a lien creditor could avoid under state law. 11 U.S.C. § 544(a)(1). The Uniform Commercial Code determines priority as between different types of creditors with different security interests. Pursuant to Uniform Commercial Code § 9-317, a lien

17

creditor takes priority over a security interest that is unperfected. *See* Uniform Commercial Code, § 9-317(a)(2).

Given that Plaintiffs' argument for an equitable lien assumes that the October Transactions were valid and, as a result, any prior liens of the Plaintiffs on the Collateral were properly released, Plaintiffs are arguing for the imposition of a new equitable lien, which would not be perfected. As noted above, if the October Transactions are valid, then Plaintiffs agree that their security interest in the Collateral could be extinguished and those transactions resulted in "STG transfer[ing the Collateral] securing Plaintiffs' Loans to UnSub, thereby depriving Plaintiffs of their security interests in those assets." *Id.* ¶ 292. Plaintiffs do not allege that (i) any Debtor granted a new security interest for the benefit of Plaintiffs as part of the October 2024 Transaction or (ii) that any UCC financing statement or other means of perfection was filed against the UnSub. As a result, because any such equitable lien would be unperfected, a hypothetical lien creditor would have priority over such equitable lien. Because a hypothetical lien creditor would have priority over such equitable lien, the equitable lien itself is subject to avoidance under Section 544(a)(1) of the Bankruptcy Code.

Accordingly, Plaintiffs' request for an equitable lien is futile and must be dismissed.[12]

### C.      Plaintiffs' Equitable Claim Is Improper as a Matter of Law

While the Court should deny the Equitable Claim on the merits for the reasons discussed above, it may also dismiss that claim without reaching the merits for two independent reasons. First, the availability of monetary damages forecloses Plaintiffs' requested equitable relief under

---

[12] To the extent that Plaintiffs assert a standalone cause of action for equitable liens, that should be dismissed because "[a]n equitable lien is a remedy, not an independent cause of action . . . [and] a claim for 'equitable lien' cannot stand as an independent cause of action." *SFR Invs. Pool 1, LLC v. NewRez LLC*, 2022 WL 17061225, at *5 (D. Nev. Nov. 17, 2022).

10172634

New York law.  Second, the Equitable Claim is impermissibly duplicative of Plaintiffs' contract-breach and declaratory judgment claims.

### 1.    New York Law prohibits the Equitable Claim because it seeks equitable relief when monetary relief is available.

The equitable remedies Plaintiffs seek through the Equitable Claim are not available to Plaintiffs because "an adequate remedy at law exists"—damages.  *SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 363 (2d Cir. 1974).  "[D]amages are always the default remedy for breach of contract[,]" *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996), because, where "the impact of [a] challenged . . .  transaction is essentially economic, . . . 'unscrambling'—restoration to pre-transaction positions—is not necessary to remedy any harm if [a] [p]laintiff succeeds on its claims." *Solus*, 2018 WL 620490, at *6.  So when damages are available, as is the case here, equitable remedies are not.  *See Lichtyger v. Franchard Corp.*, 18 N.Y.2d 528, 537 (1966) (dismissing equitable remedies); *Lantau Holdings Ltd. v. General Pac. Grp. Ltd.*, 163 A.D.3d 407, 409 (1st Dep't 2018) (monetary damages sought by plaintiff were "adequate remedy at law" (citation omitted)).[13]

To be sure, Plaintiffs assert the Equitable Claim in the alternative to their contract-breach claims.  But equitable relief is only permitted where the requesting party can plausibly show that money damages are unavailable or cannot be calculated.  *See Nasdaq, Inc. v. Exchange Traded Mgrs. Grp., LLC*, 431 F. Supp. 3d 176, 274 (S.D.N.Y. 2019).  And there is no credible argument that monetary damages are unavailable or not reasonably calculable in this instance.[14]  Plaintiffs'

---

[13] The New York State Court noted that "Defendants argue that Plaintiffs' request for declaratory judgment should be denied because monetary damages constitute a sufficient remedy to redress any losses arising from the alleged breaches of contract."  Compl. Ex. A at 20.  But it did not resolve this question.

[14] The New York State Court did not hold otherwise.  *Cf.* Compl. Ex. A at 21 ("Defendants' speculation that it is impossible or impracticable to unwind the October Transaction is premature.").

10172634

own pleading even provides their proposed methodology for quantifying the alleged harm from the October Transactions. *See, e.g.*, Compl. ¶ 114 ("The reduction in value of the Loans as a result of the Scheme is reflected in their trading prices."). At bottom, Plaintiffs ultimately seek to have received same economics as if they participated in the October Transactions, and monetary damages are certainly available to remedy that exclusively economic harm.

"But even if equitable relief were available here (which it is not), [the Court should] find[] as a matter of its discretion and based on the facts of this case that it would not award an equitable remedy and would instead award money damages," as the District Court for the Southern District of Texas held in *Wesco Aircraft Holdings, Inc. v. SSD Investments Ltd.* 2025 WL 3514358, *16 (S.D. Tex. Dec. 8, 2025) (reversing the bankruptcy court order granting an equitable remedy in part because "the proper remedy if Wesco had breached the 2026 Indenture would have been a declaration that Wesco is liable for money damages for the purported breach, not" an equitable remedy). There, the court held that equitable relief was not available because monetary relief was available. *Id.* It then noted that a monetary award was "[e]specially" appropriate "under the circumstances of th[e] case, where the parties entered into the 2022 Transactions believing that they would not breach Wesco's obligations under its indentures and where the 2022 Transactions provided Wesco with $250 million in much-needed rescue financing, extended the maturities on its debt, and substantially decreased its cash-interest payments . . . ." *Id.* So too here.

### 2. Plaintiffs' Equitable Claim is impermissibly duplicative of their other claims.

A claim should be "dismissed as duplicative" where it "seeks identical relief [as another claim] based upon the same facts and circumstances." *Alper v. Seavey*, 9 A.D.3d 263, 266 (1st Dep't 2004). And the two claims "need not be identical in every respect"; "[i]t is enough that [the

20

10172634

causes of action] arise from the same operative facts." *Mill Fin., LLC*, 122 A.D.3d at 104–05. That is the case here.

To start, Plaintiffs' Equitable Claim and implied-covenant claim are duplicative. Plaintiffs bring both claims in the alternative—*i.e.*, "if the Fifth Amended Agreement granted Defendants the discretion to enter into the Sixth Amended Agreement," Compl. ¶ 278 (implied-covenant) and "[i]f the Court finds that the Scheme was valid," *id*. ¶ 286 (Equitable Claim). Plaintiffs seek substantially similar relief from both claims—i.e., equitable relief that would put Plaintiffs in the same position as if the October Transactions did not occur (or better). *Compare id*. ¶ 283 ("avoidance of the Loan prepayments made by STG in connection with the Scheme, of STG's transfer of assets to UnSub in the Scheme, and of the UnSub Loans and the obligations of STG incurred in the Scheme") *with id*. ¶ 289 ("any and all claims of the Defendant Lenders as a lender of the debtors should be subordinated for purposes of distribution to the claims of Plaintiffs") *and id*. ¶ 293 ("Plaintiffs are entitled to equitable liens to the Collateral . . . with priority over any liens purportedly held by the Defendant Lenders through their holding of the UnSub Loans."). And Plaintiffs' factual allegations supporting both claims are near mirror images:

- Plaintiffs expected their first-lien loans would receive equal and fair treatment, that all Lenders would bear the consequences of any amendments, and that no change in subordination or priority of their liens would occur. *Compare id*. ¶ 279 (implied covenant) *with id*. ¶ 287 (Equitable Claim) and *id*. ¶ 291 (same).

- Defendant Lenders secretly breached this reasonable expectation through the bad-faith Sixth Amendment which transferred Collateral, prepaid Defendant Lenders' Loans, and exited Defendant Lenders from the Credit Agreement. *Compare id*. ¶¶ 280–82 (implied covenant) *with id*. ¶ 288 (Equitable Claim) and *id*. ¶ 292 (same).

The New York Supreme Court held (in Defendant Lenders' view, incorrectly) that Plaintiffs' implied-covenant claim was not duplicative of their contract-breach claims because the

21

10172634

former included the incremental allegations that Defendant Lenders' "bad faith . . . secret[]
conspir[acy] to execute the [October Transactions] . . . denied [Plaintiffs] the 'fruits of their
bargain' by the 'draconian' actions . . . whereby Defendants did not have to 'bear the
consequences' of the LMT after adoption of the SAA as Plaintiffs did."  Compl. Ex. A at 22
(citations omitted).   But those are the ***exact same*** allegations that Plaintiffs now make in support
of their Equitable Claim.   *See, e.g.*, Compl. ¶ 288 ("The Defendant Lenders' conduct was
inequitable because they executed the Scheme in ***secret*** to obtain non-*pro-rata* benefits while
simultaneously exiting the Credit Agreement (through non-*pro-rata* prepayment of their Loans) ***to
avoid suffering the consequences*** of the Scheme's ***bad faith*** amendments, which stripped lender
protections that the Defendant Lenders would not have agreed to remove if they remained parties
to the Credit Agreement." (emphases added)).

The Equitable Claim arises from the same facts and seeks identical relief [as the implied
covenant claim].   New York courts routinely dismiss such claims.  *Havell Cap. Enhanced Mun.
Income Fund, L.P. v. Citibank, N.A.*, 84 A.D.3d 588, 588 (1st Dep't 2011).[15]  This Court should
follow suit.

In addition, Plaintiffs' contract-breach and declaratory-judgment claims are duplicative of
Plaintiffs' Equitable Claim because Plaintiffs' Equitable Claim arises from the same alleged
conduct at issue in their claims for declaratory judgment and breach of the Credit Agreement:
STG's, Antares', and Defendant Lenders' agreement to the Sixth Amendment and consummation
of the Transactions.

---

[15] *See also Netologic, Inc. v. Goldman Sachs Grp., Inc.*, 110 A.D.3d 433, 433–34 (1st Dep't 2013); *Canstar v. J.A.
Jones Constr. Co.*, 212 A.D.2d 452, 453 (1st Dep't 1995); *MBIA Ins. Co. v. GMAC Mortg. LLC*, 914 N.Y.S.2d 604,
611 (N.Y. Sup. Ct. 2010); *Coast to Coast Energy, Inc. v. Gasarch*, 53 N.Y.S.3d 16, 20 (1st Dep't 2017); *Audax Credit
Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp., 2021 WL 3671541 at *13 (Sup. Ct. N.Y. Cty. Aug. 16, 2021).*

10172634

Plaintiffs base their Equitable Claim on Defendants' execution of the October Transactions and the impact of those transactions on Plaintiffs' rights and interests under the Fifth Amended Credit Agreement.  Compl. ¶¶ 288, 292.  These are the same allegations and claims at issue in their breach of contract claims against STG and Antares, *see, e.g.*, *id*. ¶¶ 174–276, as well as their declaratory judgment claims against all defendants, *see, e.g.*, *id*. ¶¶ 158–173.

New York law expressly prohibits Plaintiffs from using this type of alternative pleading to get a second bite at the apple when that pleading "ar[i]se[s] from the same facts and [seek] identical damages," as is the case here.  *Havell Cap. Enhanced Mun. Income Fund, L.P.*, 84 A.D.3d at 588 ; *see Gillett*, 122 A.D.3d at 104–05 (For causes of action to be impermissibly duplicative, they "need not be identical in every respect" and "[i]t is enough that [the causes of action] arise from the same operative facts.").

## CONCLUSION

For the foregoing reasons, Defendant Lenders respectfully request that the Court dismiss with prejudice Count XV of the Complaint and the corresponding portions of the Prayer for Relief seeking equitable liens and equitable subordination against Defendant Lenders, together with such other and further relief as the Court deems just and proper.

10172634

Dated: February 18, 2026

Respectfully submitted,

*/s/ Robert M. Schechter*
**PORZIO, BROMBERG & NEWMAN, P.C.**
Robert M. Schechter, Esq.
Rachel A. Parisi, Esq.
Christopher P. Mazza, Esq.
5 Sylvan Way
P.O. Box 218
Parsippany, NJ 07054
Telephone: (973) 538-4006
E-mail: rmschechter@pbnlaw.com
  raparisi@pbnlaw.com
  cpmazza@pbnlaw.com

 -and-

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg, Esq. (*pro hac vice* pending)
C. Lee Wilson (*pro hac vice* pending)
Jason Z. Goldstein, Esq. (*pro hac vice* pending)
Nicholaus C. Mills, Esq. (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-6317
E-mail: SGreenberg@gibsondunn.com
  CLWilson@gibsondunn.com
  JGoldstein@gibsondunn.com
  NMills@gibsondunn.com

*Co-Counsel to Defendant Lenders*

10172634